UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| I.B.E.W. PACIFIC COAST PENSION FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:09-CV-119 |
| v. | ) | (GUYTON) |
| | ) | |
| CLETA M. LEE, and | ) | |
| LOIS A. LEE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment. [Doc. 34]. This case is now before the undersigned for disposition of an interpleader action brought by I.B.E.W. Pacific Coast Pension Fund (the "Pension Fund"). The Pension Fund has filed a Motion for Summary Judgment and Memorandum in Support [Docs. 11 and 12], seeking a declaration of whether Cleta M. Lee or Lois A. Lee is entitled to survivor benefits under the decedent Wayne A. Lee's "50% Husband-and-Wife Pension" plan (the "Plan"). For the reasons set forth more fully below, the Court holds that Cleta M. Lee was the legal spouse of the decedent at the time of his death, and therefore she is the proper beneficiary under the Plan.

## I. BACKGROUND

On March 18, 2009, the Pension Fund brought an interpleader action pursuant to Rule 22 of the Federal Rules of Civil Procedure to have the District Court determine whether Lois A. Lee or Cleta M. Lee is entitled to survivor benefits under Wayne A. Lee's Plan.[1] Rule 22 provides that "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead." Fed. R. Civ. P. 22(a)(1). As stated by the Sixth Circuit Court of Appeals, this rule

> allows a party to join all other claimants as adverse parties when their claims are such that the stakeholder may be exposed to multiple liability. This permits the insurance company, the stakeholder who has no claim to the money and is willing to release it to the rightful claimant, "to put the money . . . in dispute into court, withdraw from the proceeding, and leave the claimants to litigate between themselves the ownership of the fund in court."

Metro. Life Ins. Co. v. Marsh, 119 F.3d 415, 418 (6th Cir. 1997) (quoting Commercial Union Ins. Co. v. United States, 999 F.2d 581, 583 (D.C. Cir. 1993) (citation omitted)).

The Pension Fund's motion for summary judgment was originally decided by the District Court on September 9, 2010. The factual background of this case is fully set forth in the District Court's Memorandum and Order [Doc. 16], and thus it does not need to be repeated here. In its Memorandum and Order, the District Court granted the Pension Fund's motion for summary judgment[2], finding that Lois was entitled to the survivor benefits under the Plan. The District Court held that the Plan documents supplied the exclusive basis for settling a beneficiary dispute,

---

[1] Because the decedent and the Defendants share the same last name, the Court will address each of them by their first names in order to avoid confusion.

[2] In its Memorandum and Order, the District Court noted, and this Court agrees, that the Pension Fund's motion for summary judgment would have been more appropriately styled as a "Brief in Support of their Complaint" because the Pension Fund is only a stakeholder in this action and thus has no interest in the outcome of the litigation. Therefore, it is not technically correct to state that the Court enters a judgment in favor of or against the Pension Fund because the judgment is meant to affect the interests of the Defendants.

and that because Wayne had named Lois as his spouse and beneficiary under the Plan, Lois was the proper beneficiary.

The judgment was appealed to the Sixth Circuit Court of Appeals who reversed and remanded the District Court's judgment. [Doc. 25]. The Court of Appeals held that pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), the Plan documents required the Pension Fund to pay survivor benefits to Wayne's legal spouse, unless the spouse had consented in writing that she waived joint and survivor benefits under the Plan. Although the Court of Appeals agreed that Wayne had entered into a marriage with Lois and had designated her as his spousal beneficiary under the Plan, the Court of Appeals held that no finding was made below as to whether the marriage between Wayne and Cleta had been legally dissolved prior to Wayne's marriage to Lois, and thus whether Lois and Wayne were legally married at the time of his death. Because the Pension Fund must pay survivor benefits to Wayne's legal spouse in order to comply with ERISA and the Plan documents, the Court of Appeals remanded the case for the District Court to determine: (1) which woman was Wayne's legal spouse at the time of his death, and (2) the proper beneficiary under the Plan.

## II. POSITION OF THE PARTIES

Cleta maintains that she has been married to Wayne since 1979. [Docs. 7, 28, and 35]. Although she acknowledges that Wayne and Lois went through some sort of marriage ceremony in 1995, Cleta submits that she never filed for divorce from Wayne nor was she served with divorce papers from him. Cleta states that in 1999, she contacted Wayne to talk with him about filing for divorce and receiving half of his social security and retirement benefits. During their conversation, Cleta maintains that Wayne told her that he never filed for divorce and that he had

mistakenly believed that she had divorced him in 1995. After realizing from their conversation that no divorce had occurred, Cleta asserts that Wayne asked her not to file for divorce because he could not afford to lose half of his retirement and that she would receive his pension benefits upon his death because Lois would not remarry him. Cleta agreed not to file for divorce.

Lois maintains [Doc. 6] that in 1995, she married Wayne in good faith, believing that he had been divorced, and that she had no reason to believe otherwise. Lois asserts that during her 10 year marriage to Wayne, she was never told by Wayne, his children, or Cleta that a divorce had never occurred between him and Cleta. Because she and Wayne had entered into a marriage and Wayne had designated her as his spousal beneficiary under the Plan, Lois submits that she is entitled to the survivor benefits as Wayne's widow.

The Pension Fund, as a stakeholder, maintains [Doc. 12] that it has a neutral interest in the outcome of this case and wishes to discharge its obligation in the matter by paying benefits to the proper beneficiary. Thus, the Pension Fund asks the Court to determine which woman is entitled to receive the benefits under the Plan. The Pension Fund states that if Lois is entitled to the benefits she would continue receiving $721.00 per month. However, if Cleta is entitled to the survivor benefits, she would be entitled to receive $714.00 per month. The Pension Fund attributes the difference between the two amounts to the beneficiary's age, Cleta being younger than Lois. Moreover, because the pension was calculated in part on the age of Lois, if Cleta is found to be entitled to the survivor benefits, the Pension Fund asserts that it has overpaid Wayne in the amount of $1,738.00.

## III. FINDINGS OF FACT

The Pension Fund is a labor management trust fund established by collective bargaining agreements under 29 U.S.C. § 186. [Doc. 1 at 1]. Wayne was a member of the International Brotherhood of Electrical Workers ("I.B.E.W.") Local Union 46 between November 1978 and December 1991. [Doc. 1-1 at 1-2]. During this time, Wayne worked in positions that were considered "credited services" under the Pension Fund. [Id.].

On February 26, 1979, Wayne married Cleta in Snohomish County, Washington. [Doc. 1-2 at 4]. In 1993, Wayne moved to Mississippi to look for work while Cleta stayed in Washington. [Doc. 28 at ¶ 9]. While living in Mississippi, Wayne subsequently married Lois on September 25, 1995, in Jackson County, Mississippi. [Doc. 1-1 at 9].

On April 1, 1997, Wayne made plans to retire and applied to receive pension benefits from the Pension Fund. [Doc. 1-1]. In his pension application, Wayne identified his marital status as "Married" to "Lois Ann Lee" and attached a Mississippi marriage license to his application. [Id. at 3, 9]. Wayne elected the "50% Husband-and-Wife Pension" plan which entitled his spouse to receive monthly survivor benefits payable at his death. [Id. at 5]. Lois signed part of the application that required the "Spouse's Signature." [Id. at 6].

On January 16, 2006, Wayne passed away. [Doc. 10-1 at 38]. A letter from the Pension Fund dated February 7, 2006, states that effective February 1, 2006, Lois would begin receiving a monthly benefit payment in the amount of $721.00 per month. [Id. at 34]. On February 13, 2009, Cleta submitted a Survivor Death Benefit Application to the Pension Fund stating that she was Wayne's spouse and was entitled to his pension benefits. [Doc. 1-2]. Cleta attached a Washington marriage certificate to the application, memorializing her marriage to Wayne. [Id. at 4].

## IV. STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the burden of establishing that no genuine issues of material fact exist. Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986); Moore v. Philip Morris Cos., 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Burchett v. Kiefer, 301 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." Curtis v. Universal Match Corp., Inc., 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing Celotex, 477 U.S. at 317).

To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id. The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact. Id. at 250. The Court does not weigh the evidence or determine the truth of the matter. Id. at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479–80 (6th Cir. 1989).

## V. ANALYSIS

The Court has considered the parties' position, and for the reasons stated more fully below, the Court finds that the Plaintiff is entitled to judgment, whereby the Court holds that Cleta was Wayne's legal spouse at the time of his death which makes Cleta the proper beneficiary under the Plan.

### A. *ERISA Mandate*

The Sixth Circuit Court of Appeals has uniformly held that ERISA supplies the rule of law for resolving beneficiary disputes. McMillan v. Parrott, 913 F.2d 310, 311 (6th Cir. 1990); Metro. Life Ins. Co. v. Pressley, 82 F.3d 126, 130 (6th Cir. 1996); see also 29 U.S.C. § 1001 et seq. This view relies on the ERISA provision requiring a plan administrator to discharge its duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The Court of Appeals has interpreted this section as "a clear mandate that plan administrators follow plan documents to determine the designated beneficiary." Marsh, 119 F.3d at 420; see also McMillan, 914 F.3d at 311-12; Pressley, 82 F.2d at 130. Thus, to the extent that the plan documents provide a "workable means of identifying beneficiaries," the plan administrator "need look no further" for settling disputes regarding the appropriate beneficiary under a pension plan. Union Sec. Ins. Co. v. Blakeley, 636 F.3d 275, 277 (6th Cir. 2011) (citing McMillan, 914 F.3d at 312).

Here, looking at the Plan documents, Wayne elected the "50% Husband and Wife Pension" on his pension application. The Plan is governed by Article 7[3] of the "Pension Plan for the I.B.E.W. Pacific Coast Pension Fund" [Doc. 10-2 at 34-40, 68-72] which directs the administration of the Plan. Pursuant to Article 7, the Plan provides a lifetime pension for a

---

[3] The Court's discussion of Article 7 reflects the changes that were made to the article by Amendment No. 21. The amendment was passed by the I.B.E.W. Board of Trustees on April 1, 2008, and revised portions of Article 7.

7

married participant's spouse upon the participant's death in an amount that is equal to one-half the amount the participant had been receiving. [Id. at 34]. For the surviving spouse to be eligible to receive payment of benefits under the Plan, the surviving spouse must have been married to the participant the entire year preceding the participant's death, the participant and surviving spouse must have been married to one another by the participant's annuity starting date, and prior to the annuity starting date, the participant must have filed a written representation of his or her marital status which the I.B.E.W. Board of Trustees may rely on. [Doc. 10-2 at 38]. Moreover, the Plan documents define "spouse" as "a person of the opposite sex to whom a Participant is legally married." [Id. at 33].

In the present case, there is no dispute that Wayne named Lois as his spousal beneficiary on his pension application. However, the inquiry does not end there. The Plan must also be administered in accordance with the rest of the Plan documents, particularly Article 7. Article 7 directs that the pension benefits must be paid to the surviving spouse which, according to the Plan documents, is the spouse legally married to Wayne at the time of his death. Consistent with 29 U.S.C. § 1055(c)(2)(A)[4], Article 7 provides that for anyone other than the participant's surviving spouse to receive the benefits under the Plan, the spouse must consent in a signed writing to such rejection. [Doc. 10-2 at 35].

The Court finds that the Plan documents alone do not provide "a workable means" for settling the current beneficiary dispute because the documents do not resolve the issue of which woman was legally married to Wayne at the time of his death. If Lois was Wayne's legal spouse

---

[4] Section 1055(c)(2)(A) provides that a participant to an ERISA pension plan may "waive the qualified joint and survivor annuity form of benefit" in two limiting circumstances including when:
> (i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public . . . .

8

at the time of his death, she would be entitled to the pension benefits because she was designated as the spousal beneficiary on his pension application. However, if Cleta was the legal spouse at the time of Wayne's death, Lois would not be entitled to the benefits because Cleta would have had to consent in writing that someone other than herself could receive the benefits under the Plan. Thus, the Court must determine who Wayne's legal spouse was at the time of his death. See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden, 448 F.3d 918, 924 (6th Cir. 2006).

B.  *Choice of Law*

To resolve the status of the two competing marriages, the Court must decide which states' law applies—Washington, Mississippi, or Tennessee—to determining the validity of the marriages. A court's analysis for determining which states' law applies in an ERISA case is "governed by the choice of law principles derived from federal common law." Med. Mutual of Ohio v. deSoto, 245 F.3d 561, 570 (6th Cir. 2001) (citation omitted). "In the absence of any established body of federal choice of law rules, we begin with the Restatement (Second) of Conflicts of Laws . . . ." Id. "Where a legal issue turns on a person's status, the choice of law issue is evaluated under the specific section [of the restatement] related to that status regardless of the nature of the underlying legal issue." Durden, 448 F.3d at 925.

Here, the Court finds the relevant section of the restatement is section 283 which governs the law applicable to determining the validity of marriage. Section 283, in pertinent part, provides that "[t]he validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage under the principles stated in § 6." Comment a to section 283 explains that the rule "is concerned with what law governs the validity of a marriage as such, namely with what law

9

determines, without regard to any incident involving the marriage, whether a man and a woman are husband and wife."

As a threshold matter, there must be an actual conflict between the laws of the states who have an interest in the litigation to trigger a choice of law analysis. Seals v. Delta Air Lines, Inc., 924 F. Supp. 854, 859 (E.D. Tenn. 1996) (citing Hataway v. McKinley, 830 S.W.2d 53, 55 (Tenn. 1992)); see also CenTra, Inc. v. Estrin, 538 F.3d 402, 409 (6th Cir. 2008) (foregoing a choice of law analysis because the possible sources of law governing the issue at hand were consistent with one another "making any asserted conflict of laws a false conflict"). In other words, the Court must determine whether a conflict exists among the laws of Washington, Mississippi, and Tennessee in regards to each state's laws governing the validity of a marriage.

Washington law provides that when a man and woman enter into a solemnized marriage, the marriage gives rise to a presumption that each party was qualified to enter into that marriage and that the marriage was legal in all other respects. Washington v. Frenger, 291 P. 1089, 1090 (Wash. 1930). This presumption attaches with full force to a second or subsequent marriage. Id. Therefore, Washington law raises a presumption in favor of the validity of a second marriage even in the face of evidence that one of the spouses has previously been involved in a prior marriage. Id. The party attacking the validity of the second marriage has the burden of overcoming the presumption by providing "strong, distinct, and satisfactory" evidence that the second marriage is not legal. Donofrio v. Donofrio, 8 P.2d 966, 967 (Wash. 1932).

Mississippi follows similar suit. When a marriage ceremony is conducted, the law presumes that all essentials required for a valid marriage existed at the time of the ceremony. Smith v. Weir, 387 So.2d 761, 763 (Miss. 1980). As such, the law presumes that when a second marriage occurs, the first marriage was legally terminated. Id. Thus, Mississippi holds a

10

presumption of validity in favor of a second marriage, and "the party attacking the validity of such marriage has the burden of proving its invalidity. . . ." Pigford Bros. Const. Co. v. Evans, 83 So. 2d 622, 625 (Miss. 1955). To overcome the presumption, "cogent and conclusive" evidence must be presented that would fairly lead to the conclusion that a divorce or other legal dissolution of the prior marriage never occurred. Smith, 387 So.2d at 763 (citation omitted).

Finally, the law of Tennessee appears to be in line with the rules applied by both Washington and Mississippi. "[I]n Tennessee, regularly solemnized marriages are presumed to be valid." Guzman v. Alvares, 205 S.W.3d 375, 380 (Tenn. 2006) (citation omitted). This presumption applies to subsequent marriages because the law presumes that the previous marriage ended in divorce. Id. (citation omitted). The party challenging the validity of the subsequent marriage has the burden of proving by "cogent and convincing" evidence that the later marriage is invalid. Id.

In light of each state's law, the Court finds that Washington, Mississippi, and Tennessee all observe the same rule of law in regards to determining the validity of a marriage. Specifically, the Court finds that when a party enters into a solemnized marriage, all three states presume that the marriage is valid, the presumption attaches to a second (or subsequent) marriage because the prior marriage is presumed to have been legally dissolved, and the party attacking the validity of such marriage has the burden of proving by cogent and convincing evidence[5] that the marriage is invalid. Accordingly, the Court finds that a false conflict exits and it may therefore apply Tennessee law. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 816, (1985) (holding that under choice of law principles, there can be no constitutional injury

---

[5] The Court notes that the "cogent and convincing" standard of proof is identical to the "strong, distinct, and satisfactory" standard articulated by Washington case law. See Rutledge v. Rutledge, 293 S.W.2d 21, 26 (Tenn. Ct. App. 1953); (holding that cogent and convincing evidence is evidence that is "strong, distinct, satisfactory, and conclusive"); see also In re Sloan's Estate, 96 P. 684, 685 (Wash. 1908) (characterizing the standard of proof to overcome the presumption as "clear and cogent proof").

11

applying forum law if the forum's law does not conflict with any other jurisdiction having an interest in the lawsuit); see also Gov't Employees Ins. Co. v. Bloodworth, No. M2003-02986-COAR10CV, 2007 WL 1966022, at *29 (Tenn. Ct. App. June 29, 2007) (stating that "[w]here there is only a false conflict, the court may ignore choice of law questions and apply forum law") (citation omitted).

  C. *Application of Tennessee Law*

  Applying Tennessee law to the case at hand, the Court finds that there is a presumption favoring the validity of Wayne's second marriage. It is undisputed by the record that in 1995, Wayne and Lois entered into a solemnized marriage. Thus, the law presumes that when Wayne married Lois, his prior marriage to Cleta had been dissolved by divorce. Because Cleta is the party attacking the validity of the second marriage, she has the burden of overcoming the presumption by cogent and convincing evidence.

  The Tennessee Supreme Court has held that the standard of proof for cogent and convincing evidence is the same as the standard of proof for clear and convincing evidence. In re Estate of Smallman, 398 S.W.3d 134, 155 (Tenn. 2013). "Clear and convincing evidence is evidence establishing that the facts asserted are highly probable; it is evidence that leaves 'no serious or substantial doubt about the correctness of the conclusions drawn' therefrom." Id. (quotation omitted).

  Under this standard of proof, the presumption may be overcome "by evidence that the records of the courts had been searched where such divorce decree or judgment should be found, if in existence at all, and that they show no such entry." Gamble v. Rucker, 137 S.W. 499, 499 (Tenn. 1911); see also Emmit v. Emmit, 174 S.W.3d 248, 252 (Tenn. Ct. App. 2005) (holding that the "presumption may be overcome by evidence that a general search of the court records of

12

divorce produced no record of a divorce"). However, the presumption may also be overcome by other direct or circumstantial evidence so long as such evidence is cogent and convening. Barnes v. Barnes, No. E2003-00070-COA-R3CV, 2004 WL 115148, at *5 (Tenn. Ct. App. Jan. 23, 2004); see also Payne v. Payne, 219 S.W. 4, 6-7 (Tenn. 1920), (finding that the testimony of the first wife was sufficient to demonstrate that a divorce of the first marriage never occurred).

Here, Cleta presents the following testimony as evidence that a divorce never occurred between her and Wayne. Cleta states that Wayne became vested under the Plan while living and working in Washington. [Doc. 28-1 at ¶¶ 4-5]. To ensure Wayne remained vested, Cleta would personally deliver his pension contributions to the Pension Fund's office. [Id. at ¶ 6].

Cleta states that in 1993, when Wayne left for Mississippi, she decided to stay in Washington with their children and stepchildren so she could take care of her dying mother. [Id. at ¶ 10]. In 1996, Cleta learned of Wayne's subsequent marriage to Lois after Cleta's grandson and two of her daughters had returned from visiting Wayne in Mississippi. [Id. at ¶ 12]. Cleta also learned from her son, who was living with Wayne at the time, that Lois had moved to Tennessee and that Wayne had other women living with him. [Id. at ¶ 14]. Based upon this information, Cleta believed that Wayne had not actually remarried and that it would have been impossible for him to do so since their marriage had never been dissolved. [Id.]. Moreover, because Cleta and Wayne had several children and stepchildren together, Cleta maintains that she and Wayne remained in contact with one another over the years and that Wayne had always acknowledged to her that no divorce had ever occurred between the two of them. [Id. at ¶ 25].

In 1999, Cleta states that she spoke with Wayne about getting a divorce in exchange for half of his social security and pension benefits. [Id. at ¶ 18]. However, Wayne convinced Cleta not to file for divorce because a divorce would have left him in a position of financial hardship

13

and that a divorce was unnecessary because Cleta would be entitled to his pension benefits as his surviving spouse. [Id.]. Cleta provides that although she no longer was in love with Wayne, she decided not to file for divorce because she still cared about Wayne's well-being and that Wayne was a good father to their children. [Id. at ¶ 21].

Statements from Sherry L. Puhl [Doc. 14 at 8] and Misty Weinell [Id. at 9], Cleta's daughters, and Peggy Effler [Id. at 10-11], a family relative, were also submitted as evidence that Cleta and Wayne never divorced and that Lois had knowledge of the fact. Ms. Puhl states that she learned from Wayne that he had told Lois at some point during the last two years of his life that he and Lois were not legally married. [Id. at 9]. Ms. Weinell confirms the same and adds that when Lois discovered she was not legally married to Wayne, she left him for a short period of time but decided to return and stay with Wayne until his death. [Id. at 9]. Finally, Ms. Effler states that during a fight between Wayne and Lois, she heard Wayne tell Lois that he was still married to Cleta. [Id. at 11].

In light of the above, the Court finds that Cleta has provided sufficient evidence to overcome the presumption, for several reasons. First, the record demonstrates that Wayne became vested under the Plan between 1978 and 1991, while he was working in Washington and living with Cleta as husband and wife. Thus, the Court finds that Cleta not only had knowledge of the Plan but also knew that she would have been entitled to survivor benefits under the Plan as Wayne's wife. Such knowledge would have assured Cleta that remaining married to Wayne, despite their separate living arrangements, would entitle her to the pension benefits. If a divorce had occurred, the Court finds that Cleta would have sought payment of the benefits then. However, because Cleta waited to seek payment of the pension benefits until after Wayne's

14

death rather than during his lifetime, the Court finds Cleta's assertion that she and Wayne never divorced credible.

Moreover, the Court gives credence to Cleta's testimony that she and Wayne had spoken in 1999, about getting a divorce but decided against it. The record establishes that Cleta and Wayne had children and stepchildren together, several of the children lived with or visited Wayne from time to time in Mississippi, and around 2003, Wayne had returned to Washington to visit his family. Based upon Wayne's continued contact with his family in Washington, the Court finds that Cleta and Wayne likewise remained in contact with one another while Wayne lived in Mississippi and Tennessee. Because Cleta and Wayne remained in contact, the Court finds credible Cleta's testimony that she refrained from divorcing Wayne, because Wayne continued to be a good father to their children, and because Cleta was concerned about Wayne's well-being. The statements made by Ms. Puhl and Ms. Weinell also lend support that their stepfather, Wayne, had always acknowledged that he was still married to Cleta.

Based upon the foregoing, the Court is left with no serious doubt about the conclusions drawn from the evidence above, and the Court finds that Cleta and Wayne never divorced. Accordingly, the Court finds that Cleta was Wayne's legal spouse at the time of his death. Because Cleta has not waived her right as the spousal beneficiary under the Plan, the Court finds that Cleta is also the proper beneficiary under the Plan.

## VI. CONCLUSION

For the foregoing reasons, the Pension Fund's Motion for Summary Judgment [**Doc. 11**] is **GRANTED**, whereby the Court holds that Cleta is the beneficiary under the Plan, as administered by the Pension Fund. Having determined that Cleta is the proper beneficiary, this lawsuit is **DISMISSED**. The Clerk of Court **SHALL ENTER** a judgment consistent with this opinion.

**IT IS SO ORDERED.**

                              **ENTER:**

                                s/ H. Bruce Guyton
                              United States Magistrate Judge